SHOWALTER, Circuit Judge,
after making the foregoing statement, delivered the opinion of the court.
Appellee, being receiver, represents, in a sense, the creditors of the Chicago & South Atlantic Railroad Company. The sum recovered, $168,922.88, with interest, as allowed, now amounts to more than $312,000. This money, or a large part thereof, would doubtless be used by the receiver in discharge of the debts of the Chicago & South Atlantic Railroad Company. But it is the right of the company which is in question. No creditor is here asserting any lien in his own right; nor is it anywhere intimated as a theory of the case that certain creditors had liens in their own right, and that by a species of subrogation the debtor company may, in this proceeding, assert such liens. As the record comes before this court, the creditors have no right which transcends that of the company. If there were no creditors, and the purpose were to divide the large sum mentioned above among the few persons who made the trifling *751 subscription to the stock of the Chicago & South Atlantic, the question of recovery here would be precisely the same as it is. The people of Indiana along the proposed route were much interested in the enterprise which formed the subject-matter of the contracts of 1873 and 1875. By the laws of that state they, in the form of municipal corporations, were empowered to make donations, subsidies, and subscriptions in aid of the franchise granted to the Delphi Company to build the road. Individual property owners could, of course, make such donations as they saw fit. It was hardly expected that any municipal or other subscription to the stock of the Delphi Company would yield direct profit. The scheme evidently was to solicit and obtain donations, subsidies, and subscriptions, and use the same, or the proceeds thereof, in the work of initial construction, and then use the unfinished road as the basis of credit to secure means for ■completion. The appeal for municipal aid, it was evidently thought, would meet with a more liberal response if the road to be built in Indiana could be represented as part of a continuous line from Chicago to the South Atlantic seaboard; hence the organization of the Chicago & South Atlantic Bailroad Company, and the compact between the two corporations shown by the writings of 1873 and 1875. The Chicago & South Atlantic was at liberty, of course, to provide .means out of its own proper resources to be used in the construction -of the road from the Indiana state line to Indianapolis, but no engagement to do so distinctly appears in either writing. Whether it was possible for the Delphi Company to alienate the franchise to ■build the road, that company did not do so. Section 8 of the writing of 1875 is explicit upon the point. The liberty and authority of the Chicago & South Atlantic to build the road in Indiana, and ¡solicit, accept, and use in construction work in Indiana donations, ■subsidies, and subscriptions from property owners and municipal ■corporations along the route in that state, must be referred to the .contract with the Delphi Company. All such donations, subsidies, .and subscriptions, together with the stock of the Delphi Company undisposed of at the time of the execution of the writing of 1873, and all other property of the Delphi Company then on hand, was by the contract made subject to a special or limited ownership in the Chicago & South Atlantic. Since all construction work in In-diana was under the Delphi Company’s franchise, and would otherwise have been without legal sanction, all donations, subsidies, and aids volunteered towards the work in Indiana, whether before or pending the contract, must have been initially the property of the Delphi Company. It was by force of the contract that these “things ■of value” were subject to the dominion of the Chicago & South Atlantic Bailroad Company. That this was the understanding is apparent more particularly from the last sentence of the first paragraph of the preamble to the treaty of 1873, from the sections marked 1 and 2 of that same writing and from sections 5 and 8 of the writing of 1875. The section, for instance, marked 2 of the paper of 1873 in part reads:
“All moneys, lands, stocks, bonds, and other things of value that have been and shall hereafter be contributed, donated, or subscribed by any state, *752 county, city, community, corporation, or individual for the purpose of conj structing or maintaining the Indianapolis, Delphi & Chicago Railroad shalll from henceforth belong to, and he absolutely owned by, the Chicago &' SoutM Atlantic Railroad Company, subject, however,” etc. I
The Indianapolis, Delphi & Chicago Railroad is the road from! Indianapolis to the state line, which the Indianapolis, Delphi & Chi-I cago Railroad Company was authorized to build. ' That company,! retaining its franchise to so build, and being deemed, held, and byl necessary implication declared, the owner initially of everything! given in aid of said franchise, transfers a limited and special do-l minion over all the “things of value” referred to in the contract asl then extant or in expectancy to the Chicago & South Atlantic. It I may be here added that profit as to a contractor or in any other! way to the Chicago & South Atlantic was not stipulated for or pro-1 posed. When, under the administration of that company, the road should be completed, and cars running from Indianapolis to Chicago, the two corporations were to merge into a third, and the entire property was to vest in the consolidated concern. By the third section of the writing of 1875 the directors and officers of the Delphi Company and their successors “shall continue in office for the purpose of preserving and guarding the trusts created in the articles of agreement.” By the eighth section of the same writing, after the idea of a surrender or alienation of its franchise by the Delphi Company is excluded, “the true meaning and intent of” the contract is declared to be that the Chicago & South Atlantic shall be owner of the property of the Delphi Company “for the purposes hereinbefore expressed”; that is, to carry on the work of building the Indiana portion of the road in question. In the preamble to the writing of 1873 it is recited that the Delphi Company “has been and now is obtaining, and is hereafter to obtain, subscriptions and donations for the purpose of building” the road in Indiana; and the immediate purpose of the contract is expressed to be “an early commencement and completion of the work of building” the road. The property alienated or put in the dominion of the Chicago & South Atlantic by the contract was, as before noted, all the property which the Delphi Company then had, or which might, pending the contract, be given or subscribed by any person or corporation in aid of its franchise to build the road.
The limitations fixed in the contract on the ownership thus vested in the Chicago & South Atlantic appear to be three in number, and to be limitations in time. Such ownership commenced when the writing of 1873 was executed. It would cease, apparently, first, if the work of construction were not commenced on or before the 1st day of July, 1874; again, if the work were not thereafter prosecuted,— that is, followed up or carried on with substantial continuity; and again, if diligence by the Chicago & South Atlantic in such prosecution should not be commensurate with the means for the time being available. These limitations seem to be set down, the first and third in the section marked 1; the other, in the section marked 2 of the writing of 1873. The learned counsel for appellee does not identify the second of these limitations. He reads in the contract only the *753 first and third, and he insists that the cessation in the work of conftruction prior to September 29, 1877, if there were any substantial cessation, was due, not to any want of diligence on the part of the Chicago & South Atlantic Company, but to inability for want of Ineans. It would, of course, follow on this view that a cessation, liowever indefinite in time, if due to inability, would leave the own|;rship of the unfinished road in the 'Chicago & South Atlantic; that the Delphi Company, while liable to lose its charter if it did not build the road, and morally bound that construction work done with [means given by Indiana people should, in case of need to forward [the work, be a basis of credit, has yet made a contract which, in a [contingency not unlikely to happen, would leave the unfinished road in [possession of a foreign corporation unable to proceed with the work, [and yet in a position, by reason of such inability, to demand in cash the value of what had been done, before the Delphi or any person or corporation succeeding to the rights of the Delphi could go on with the work to completion. The adjudication in the circuit court was,.and the contention here, in effect, is, that the Chicago & South Atlantic had to be paid the full value of the unfinished road, even though every dollar used in construction had been given by Indiana [people, and even though the Chicago & South Atlantic had neither furnished out of its own resources, nor become liable out of its own resources for, any labor or material which had entered into the construction. This holding and contention would be sound if we take the contract to mean that the limitation on the ownership vested in the Chicago & South. Atlantic was only a want of diligence, and not a failure to prosecute the work, due to inability rather than to want of diligence. By the section marked 1 of the writing of 1873 the ownership transferred to the Chicago & South Atlantic is “upon condition that the Chicago & South Atlantic Railroad .Company ';f * shall on or before the 1st day of July, 1874, commence the construction of the” road in Indiana, “and shall thereafter prosecute the building of the same in good faith with such diligence as lies in their power until said” road “shall be completed.” By the section marked 2 all property or “things of value that have been and shall hereafter be contributed, donated, or subscribed for the purpose of constructing” the road in Indiana “shall * * * be absolutely owned by the Chicago & South Atlantic Railroad Company, subject, however, to the laws of the state of Indiana and the Indianapolis, Delphi & Chicago Railroad Company,” —meaning, apparently, subject to any obligation or condition imposed by law on the last-named company,—and also subject “to such provisions and conditions as shall be hereafter set forth.” Then follow the words: “The principal condition of ownership of said things of value by the Chicago & South Atlantic Railroad Company is fully understood and agreed to be the commencement and prosecution of the work of building” the road in Indiana. The Delphi Company, as already suggested, was subject to loss of its charter and franchise to build the road if the work of construction were not commenced and prosecuted. The primary and immediate purpose of the contract was the “early commencement and completion cf the *754 work of building.” Dominion over all property at the date of the first writing owned by the Delphi Company, or afterwards con tributed in aid of its franchise, was turned over to the Chicago & South Atlantic, not as beneficial owner, but for the purpose mentioned. If the Chicago & South Atlantic .did not commence the work of construction before the 1st of July, 1874, or if it did not thereafter use in carrying on the work the degree of diligence specified, or if for want of ability or means it ceased to carry on the work,—in any one of these contingencies its dominion or ownership over the things of value comprehended in the contract was to lapse or expire. The prosecution of the work of building the road in Indiana is one thing; diligence in such prosecution commensurate with the means at hand for the time being is another. Prosecution of the work might go on without cessation, but the degree of diligence in such prosecution might be inadequate and out of proportion to the means and instrumentalities available. The purpose here was an early commencement and completion of the work. The language of the contract expresses both conditions. They are not inconsistent. The 'Chicago & South Atlantic was expected out of its own proper resources to build the road from the Indiana state line to Chicago. It might also quite possibly build and complete the road in Indiana without other means than what was transferred to it by the contract with the Delphi Company. The Chicago & South Atlantic was privileged to pledge the unfinished road in Indiana, but such pledge would, of course, be subject to the conditions under which that company held that property. The Chicago & South Atlantic was also privileged to provide means out of its own resources to complete the work. When completed, the compensation would come in the shape of a beneficial ownership vested in the consolidated corporation. But the failure of the Chicago & South Atlantic to prosecute the work, and its loss on that account of the special dominion given by the contract over the “things of value” therein mentioned and the construction work done with said “things of value,” did not necessarily entail pecuniary loss on the Chicago & South Atlantic Company. There was no engagement by the Delphi Company that the “things of value” turned over to the Chicago & South Atlantic would be sufficient to build the road. The risk of failure to prosecute the work, and of the loss on that account of that ownership which was transferred to it by the contract, was left with the Chicago & South Atlantic.
The master states in his report that the seizure or resumption of active control by the Delphi Company in the fall of 1877 “rendered the completion of the road by the Chicago & South Atlantic impossible if it were otherwise able to have completed its construction.” He says also that the Chicago & South Atlantic Railroad Company was in 1880, “and had been for some years, without means to complete said road, yet the purpose to build said road had not been abandoned, and efforts were made by said road from time to time to raise means with which to prosecute the enterprise.” The total value, so far as the master saw fit or was able to compute, of the construction work done under the administration of the Chi *755 cago & South Atlantic, and for which that company was, according to the master, entitled to recover, was $168,922.88. This construction work, as stated in the nineteenth finding, “consisted of about 23 miles of grading, grubbing, and bridging of said railroad in Lake county, about 6 miles in Jasper county, 1 mile in White county, and 9 miles in Carroll county.” This estimate included also engineering and surveying and “rights of way paid for and covered by said work.” From what the master says in the two paragraphs of the thirty-second finding, this work must have been all done prior to the 1st day of September, 1875. On September 29, 1877, the directors of the Delphi Company declared that contract relations with the Chicago & South Atlantic were at an end, and on October 2, 1877, three days later, the Delphi Company let a contract for completion of the road to Yeoman, Hegler & Co.; and these contractors thereupon commenced work on the unfinished road. This action of the Delphi Company at once became known to the officers of the Chicago & South Atlantic. The statement by the master that “the purpose” on the part of the latter company “to build the road had not been abandoned” is immaterial. Intent, one way or another, on the matter of abandonment, was not fixed in the contract as a limitation on the ownership thereby vested in the Chicago & South Atlantic. But this finding by the master is hardly warranted. From the correspondence between the officers of the Chicago & South Atlantic, and from statements made by officers of the latter company to a committee of inquiry sent by the Delphi Company prior to September 29, 1877, and from other matters shown in evidence, the better conclusion would have been that the purpose or expectation of building the road under the contract was, in fact, given up, or at least had become secondary to another policy, namely, to claim ownership over the unfinished road for whatever advantage might result to the Chicago & South Atlantic, its stockholders and creditors. But it is not here meant that this claim was not in good faith. It was made on a construction of the contract evidently deemed sound and defensible. The contractors, Yeoman, Hegler & Co., commenced, and for a year or more carried on, their construction work on that part of the road which lay in White and Carroll counties. Active work under their contract was not resumed in Lake county until later. The conclusion of the master is that the part of the road in Lake county was not “seized” until work was so resumed thereon. He states, in general terms, that the Chicago & South Atlantic did some work on this part of the road after October 4,1S77. He says:
“In November, 1878, lumber was provided by said road to construct a bridge over the Kankakee river to the state of Indiana, and some work was done in the fall of 1878 in Lake county, and some ties were delivered at that time in said county to be used in said road, and ordered by said company.”
This is apparently a prefatory statement to what follows:
“And until the appropriation of said part of said line of road as herein set forth in Lake counts’, the same was in the possession of the Chicago & South Atlantic Railroad Company, though such road was at that time, and had been for some years, without means to complete said road, yet the purpose *756 to build said road ha'd not been abandoned, and efforts were made by sai< road from time to time to raise means with which to prosecute the enterprise.”
The master does not indicate what the work last referred to was, nor does he give any value to the same, or to the ties or lumber, if any were in fact used. The purpose of the statement is apparently to signify an assertion of right persisted in up to that time by the managing agents of the Chicago & South Atlantic. On March 12, 1876, the president of the Chicago & South Atlantic wrote to the vice president:
‘‘The work must be put under headway this spring, .otherwise we will lose our subsidies and the moral effect. * * * Now you should by all means get the road under headway.”
Other letters interchanged between the date last mentioned and October 4, 1877, indicate, as the status at the time, substantially a complete cessation of the work of construction, in response to a letter written October 3, 1877, by the president of the Chicago & South Atlantic detailing the action of the Delphi Company on September 29, 1877, and the letting of the contract by that company as before noted, the vice president wrote on October 4, 1877, “My advice is, simply protest and keep quiet.” The contention by appellant that for more than two years prior to September 29, 1877, the work of building the road in Indiana had ceased, seems well made. The Chicago & South Atlantic was advised at once of the action taken by the Delphi Company based on the failure to prosecute the work. Whatever the former company afterwards did, if-anything, in Lake county, was done with notice that the latter denied any ownership on the part of the former over any part of the road in Indiana.
It is said that the action of the Delphi Company on September 29, 1877, was a forfeiture; that the law abhors forfeitures; that time was not of the essence of the contract; and that there could be no forfeiture or rightful resumption of control by the Delphi without a formal request to the Chicago & South Atlantic to proceed, and a refusal after such request. But the contract declared that the prosecution of the work of building was a principal condition of “the ownership of* said things of value by the Chicago & South Atlantic Bailroad Company.” The contract fixed a limitation upon whatever ownership or dominion vested by that instrument in the Chicago & South Atlantic over said “things of value,” or the unfinished road so far as constructed with said “things of value.” This ownership ceased by its own limitation. The case is not one of the forfeiüire of an estate upon condition. It is an instance, rather, of a conditional limitation. The Delphi Company had to make sure as a fact of that cessation or failure to prosecute the work which by the contract limited the dominion of the Chicago & South Atlantic. In such event, there was no longer any ownership in the Chicago & South Atlantic to be displaced by re-entry. The contract made no provision for any demand or notice. The Chicago & South Atlantic was not prejudiced in any way by want of prior formal demand and notice. On the showing of the record, the un *757 finished work had been neglected, and was falling into decay. There had long been nothing more, if anything, than a mere constructive possession in the Chicago & South Atlantic. Such a possession is fictitious. It ceases with the legal ownership. In 1876 a committee was sent by the Delphi Company to inquire of the officers of the Chicago & South Atlantic whether or not, and when, if at all, the Chicago & South Atlantic proposed to go on with the work. One Gould, a member of the committee, testified that at the interview between the representatives of the two companies the statement was distinctly made on behalf of the Delphi Company, in effect, that if the work were not speedily resumed, the latter company would displace the Chicago & South Atlantic, and itself resume exclusive and active control. The vice president of the Chicago & South Atlantic testified that he did not remember any declaration so strongly put on the occasion in question. The testimony of Gould was not otherwise disputed. It makes nothing upon the rights of these corporations, as defined in the contract, that after ownership thereunder by the Chicago & South Atlantic had ceased by limitation, the Delphi Company for a time might have been still willing that the Chicago & South Atlantic should take up the work again. The original bill and the amended bill each contains the following statement: “Your orator further shows that all subscriptions, bonds, subsidies, and assets of every kind and description obtained by the Chicago & South Atlantic Railroad Company, as stated in this bill, were obtained under and in pursuance of either the original agreement or supplemental agreement * * * or both of them,”— meaning the writings of 1873 and 1875. In other words, within the scope of the bill, the subject-matter contended about in this litigation is the property of the Delphi Company on hand when the writing of 1873 was executed, everything which was subsequently given, contributed, or subscribed in aid of the franchise to build the road in Indiana, which franchise always remained, as originally vested, in the Delphi Company, and all construction work done with the means aforesaid. The master found that some portion of the construction work included by him, as already stated in the valuation of $168,922.88, had not been paid for by the Chicago & South Atlantic. How much he does not state. He does not find any lien on this work in favor of any laborer or contractor or specify any sum as due to any one. He does not show any sum raised by the Chicago & South Atlantic for, or expended on, the work in Indiana, which did not come to that company by virtue of its contract with the Delphi. He shows that donations and subscriptions aggregating some $300,000 were made in Indiana pending the contract. He does not show that the $168,922.88 was in excess of the amount actually received by the Chicago & South Atlantic from such donations and subscriptions in Indiana. Moreover, the distinct and specific purpose of the bill, as already said, was to recover the “assets * * obtained by the Chicago & South Atlantic Railroad Company under and in pursuance of either the original agreement or the supplemental agreement, * * * or both of them” (meaning the writings of 1873 and 1875); and the distinct ground of such re *758 covery is stated in the bill to be that the displacement of the Chicago & South Atlantic on September 29, 1877, was on the false and fraudulent pretense that the latter company had failed to prosecute the work of building the road in Indiana. The argument on behalf of appellee proceeds at times on the unconscious assumption that the donations, subsidies, and subscriptions by Indiana municipal corporations and people were never the property of the Delphi Company, but were initially and at all times the property of the Chicago & South Atlantic. These donations, subsidies, etc., in Indiana were, as repeatedly stated herein, in aid of the franchise to build the road. This franchise was vested in the Delphi Company. Building operations were carried on by the Chicago & South Atlantic pursuant to the Delphi franchise, and solely by force of the contract with the latter company. The initial ownership over every aid to the road is, in effect, declared as a term in the contract. Every donation or subsidy, whether pending or in futuro, is by the contract transferred from the Delphi to the Chicago & South Atlantic. The latter company got nothing of the kind except as coming from the former. It had no right, as between itself and the Delphi, to treát anything in aid of the construction work in Indiana otherwise than as initially given to the Delphi Company, and thence transferred to itself by force of the contract. One may not assert a contract and at the same time evade any term in it. A devisee who elects to take under a will must not claim adversely to the testator anything disposed of by such will. The contract between these two corporations is avowedly the foundation of the claim here sued on. The receiver cannot assert, contrary to the section marked 2 of the writing of 1873, that any “thing of value” thereafter “donated * * * for the purpose of constructing * * “ said road” in Indiana was not, by force of said section, given to the Delphi Company, and by force of said section transferred from the Delphi Company to the Chicago & South Atlantic. The property here in controversy belonged in the first instance to the Delphi Company. The Chicago & South Atlantic derived its ownership from the contract, and such ownership was subject to the limitations expressed in the contract. One of the conditions of such ownership was “the prosecution of the work of building” said road. The Chicago & South Atlantic failed to prosecute the work. Its ownership, therefore, ceased and determined. The decree is reversed, and the cause remanded, with the direction that as to this appellant the bill be dismissed for want of equity.
Mr. Justice BROWN, dubitante.
Upon the argument of this case, I was strongly inclined to the opinion that the cancellation of its contract by the Delphi Company was not made in good faith, particularly in view of the fact that there was a personal consideration passing to Mr. Haymond, and that he appeared to have acted in excess of his authority. While the cessation of the work might have authorized the Delphi Company to put an end to the contract by legal proceedings in the nature of a foreclosure, or perhaps even by notice, it did not seem to me that it could be legally done by a summary seizure and appropriation of the unfinished road, by which it *759 acquired property of the value of $1G8,000, without having paid anything for it, unless the subscriptions made by the Indiana people could be construed as having been made for its benefit. There was no provision in the contract for a forfeiture of the property acquired or the work done by the South Atlantic Company in case the contract were rescinded; and I had assumed the law to be that where a party to a cqntract for the construction of a building, railway, or other similar work elected to rescind such contract for failure to perform within the stipulated time, he could not take to himself the fruits of a part performance without making compensation in the nature of a quantum' meruit. While the application of this rule may be subject to modification to the extent to which the Delphi Company had contributed of its own means to the construction of the work, it seemed to me that, if the receiver was not entitled to recover the whole value of the property appropriated, he was equitably entitled to recover at least to the extent of the claims of the creditors of the South Atlantic Company for the work done or the materials furnished in the construction of the road.
But as my brethren have placed a different construction upon the contract and the acts of the parties, and as the case depends largely upon the view taken of the testimony, which is very voluminous, and no question of law is involved which is likely to become important as a precedent, I am disposed to acquiesce in the opinion of the majority.